219 So.2d 781 (1969)
George M. SNELLINGS, Jr., et al., Plaintiffs-Appellants,
v.
Emile Eugene LUTZ et al., Defendants-Appellees.
No. 11148.
Court of Appeal of Louisiana, Second Circuit.
February 5, 1969.
Rehearing Denied March 3, 1969.
Writ Refused May 5, 1969.
*782 McHenry, Snellings, Breard, Sartor & Shafto, Monroe, for plaintiffs-appellants.
Jones, Blackwell, Chambliss, Hobbs & Henry, West Monroe, for defendants-appellees.
*783 Before GLADNEY, BOLIN, and DIXON, JJ.
DIXON, Judge.
This is an appeal from a judgment of the trial court sustaining defendants' plea of prescription in a boundary action.
The suit was filed by George and Breard Snellings, the record owners of a tract of land bounded on the west by the Ouachita River levee and on the east by the Missouri Pacific Railroad, to fix the boundary between their land and that of the adjacent landowner to the north. This tract is bounded on the north by the property of the defendants, Emile Eugene Lutz and his three sons. To the east of the railway is U. S. Highway 165; this highway runs through both plaintiffs' and defendants' property.
The facts, as stipulated by the parties, show that this land was at one time owned by a common ancestor in title, John H. Childers. The Snellings tract was acquired by the plaintiffs' mother in 1919 and the Lutz tract was acquired by Emile Eugene Lutz in 1921. The ideal boundary separating the two tracts is the east-west center line of Sections 19 and 24. At the time the land was owned by the common ancestor, there existed a fence running east and west some 50 to 60 feet south of the ideal boundary between the Snelling tract and the Lutz tract. The fence has been in existence continuously to date. It is this strip, extending from the levee to Highway 165, that the defendants contend they have acquired by thirty years' acquisitive prescription under Civil Code Article 852, or, alternatively, under Civil Code Article 3499.
The trial judge gave written reasons for judgment sustaining the defendants' plea of prescription. He relied on Sessum v. Hemperley, 233 La. 444, 96 So.2d 832 (1957), and Article 852 of the Civil Code.
The evidence in the case consisted of stipulations between the parties and written statements, in lieu of testimony, by Emile Eugene Lutz and George M. Snellings, Jr. Mr. Lutz said that before he purchased his tract on January 26, 1921, he inspected the property, and his vendor, Childers, pointed out the fence on the south side of the tract as being one of the boundaries. Lutz said this fence appeared to be three or four years old at the time of the purchase; the fence, between the new Ouachita River levee on the west and U. S. Highway 165 (built in 1933) on the east, has been continuously maintained in the same location.
There was a 4-acre fenced pasture in the southwest portion of the Lutz property; the south fence of the pasture was part of the fence involved in this lawsuit. Except for the 4-acre pasture, the entire tract of land was cultivated down to the fence from 1923 until 1933, when a new levee on the west and the present U. S. Highway 165 were constructed. From 1933 to 1950 the property was cultivated annually down to the fence, between the levee and U. S. Highway 165. The portion of the Lutz property which lay east of Highway 165 was sold to Fred Stovall in 1941.
In 1945, Mr. Lutz leased to an outdoor advertising company billboard space; a billboard was erected facing Highway 165 on the strip of land immediately north of the fence in dispute. At least one large billboard has been maintained on this strip continuously since that time. The advertising company has paid Mr. Lutz annual rent in advance from 1945 to date, in the amount of $30 a year initially, and $50 a year presently.
In 1950 or 1951, Lutz executed a right-of-way grant to a power company for the erection of electrical transmission lines, and the lines were erected just north of and parallel to the fence in dispute. The power line has been in existence from 1951 to date.
In 1950, Mr. Lutz leased a parcel of ground fronting 150 feet on U. S. Highway 165 to H. V. Hansen. The parcel measured *784 150 feet on the highway by 250 feet. The south boundary of this parcel was 50 feet north of the fence involved in this dispute. This strip, 50 feet wide and 200 feet deep lying just north of the fence and just south of the 150 × 250 foot tract leased to Hansen, was leased to Hansen for $10 a month for the purpose of parking trailers. In 1960, the 150 × 250 foot parcel was sold to Hansen, and there was no further lease of the 50-foot wide strip. Apparently, this is the space which has been occupied by the outdoor advertising billboard. Except for properties leased, the Lutz tract between the levee and Highway 165 has been cultivated from 1923 to date, either by Mr. Lutz himself, or by his tenants.
Mr. Lutz said that Mr. Fred Peters, who owned the tract of land immediately north of the Lutz tract, having purchased it from Childers, the common ancestor in title of the plaintiffs and defendants, conveyed to him in 1930 information that the Snellings tract had been surveyed by Mr. Huey, and that all the lines up and down the river were "off about ten feet." Peters indicated that he did not intend to relocate his own property lines voluntarily, and was employing a surveyor, Mr. Collins. Mr. Lutz then employed Collins to run the Lutz property lines, and was informed by Collins that the fences varied "from an inch to a foot off the true line." Mr. Lutz says that he did not see the Huey survey, and heard no more about the boundary question until 1947.
Mr. George Snellings, Jr. wrote several letters to Mr. Lutz in 1947 about the boundary discrepancy, mentioning the Huey survey and its confirmation by a survey made in 1946 by Mr. Tom Keller. Mr. Snellings requested that the parties arrange to establish their common boundary correctly.
Mr. Lutz relates that there was a meeting one Sunday afternoon in 1947 on the levee on the back of his place. Dr. George Snellings, Mrs. Satchie Snellings, and Mr. George Snellings, Jr. were present, and asked Mr. Lutz if he intended to move his fence. Mr. Lutz stated that he replied that he would not move the fence unless it was done "right," with all the owners up and down the river joining in the move.
Mr. George M. Snellings, Jr. stated that he knew of the Huey survey in 1930, which located the fence involved in this suit from 52 to 54 feet south of the center line of Sections 24 and 19, which was the ideal boundary between the Snellings property and the Lutz property, and that the location of the fence south of the ideal boundary was a matter of family knowledge among the Snellings. In 1946, in connection with establishing the boundary on the southerly side of the Snellings property, Mr. Snellings had the property re-surveyed by Thomas Keller, who verified the Huey plat. Between January 7, 1947 and September 29, 1947, Mr. Snellings wrote five letters to Mr. Lutz concerning the boundary difficulty. During that period, he had two visits with Mr. Lutz, one in Mr. Snellings' office and the other on the Lutz property. Mr. Snellings said that Mr. Lutz "acknowledged the correctness of the Huey and Keller surveys; but that he hoped we, the Snellings, would not do anything about taking down the old fence and building a new fence on the line until he could settle the boundary with the J. E. Peters family on the Lutz' north line * * *." On the occasion of the meeting on the Lutz property, Mr. George Snellings, Jr. told Mr. Lutz that any cultivation on the strip in controversy was "by sufferance or permission of Mrs. Snellings," until a new fence was built on the property line. The purpose of the Snellings' visit with Lutz on the property was to interrupt any possible claim of prescription, according to Mr. George M. Snellings, Jr.
On another occasion, George Snellings, Jr. called on two of Mr. Lutz' sons, who are also defendants in this suit, and advised them of the boundary situation and that the Snellings family was willing for Mr. Lutz to cultivate to the old fence by their permission and sufferance.
*785 Mr. Lutz stated that the maintenance and repair of the fence involved here had been, through the years, at Mr. Lutz' sole expense. On two occasions he had asked Dr. Snellings to share in the expense. A storm damaged the property in 1934 and, after a request by Lutz, Dr. Snellings refused to share any of the expense of repair, "indicating that he thought the obligation belonged to his (Dr. Snellings') renters." In 1933 the new levee was built along the westerly side of the property, and cattle guards were installed. The Levee Board assessed the landowners $20 for each cattle guard. The cattle guard installed between the Lutz property and the Snellings property coincided with the fence line, and not the more northerly ideal boundary line. Mr. Lutz asked Dr. Snellings to contribute to the cost of the cattle guard, but Dr. Snellings did not agree, because he had no cattle.
The defense in this boundary action is primarily based on Civil Code Article 852:
"Whether the titles, exhibited by the parties, whose lands are to be limited, consist of primitive concessions or other acts by which property may be transferred, if it be proved that the person whose title is of the latest date, or those under whom he holds, have enjoyed, in good or bad faith, uninterrupted possession during thirty years, of any quantity of land beyond that mentioned in his title, he will be permitted to retain it, and his neighbor, though he have a more ancient title, will only have a right to the excess; for if one can not prescribe against his own title, he can prescribe beyond his title or for more than it calls for, provided it be by thirty years possession."
Plaintiffs-appellants specify that the trial court erred in sustaining the plea of prescription by concluding that:
"(a) That the defendants possessed the strip of land in dispute `under the title of owner';
"(b) That the possession of defendants was continuous for the required period of thirty years; and
"(c) That the old fence in question in this lawsuit was `recognized as a boundary.'"
Plaintiffs-appellants concede that defendants have possessed beyond their title for more than thirty years, but maintain that in order to establish ownership of the disputed strip between the fence and the ideal boundary by thirty years' acquisitive prescription, defendants-appellees must prove: that they have possessed "under the title of owner"; that the possession must have been "continuous, public, and unequivocal"; and that the fence involved here must have been "recognized as the boundary."
The evidence shows convincingly that defendants' possession began upon the purchase by Mr. Lutz from Childers, and that Childers had pointed out to Lutz the fence involved in this case as constituting the boundary between Lutz's property and that of the Snellings, his neighbors on the south. It is clear from the record that Lutz's first information to indicate that the fence involved might not be on the ideal boundary came in 1930 when he was told about the Huey survey by Peters, his neighbor on the north. The record does not support a contention that there might have been an interruption of defendants' possession as owner upon the acquisition of uncertain information about the location of the fence. Defendants' possession continued without change after the 1930 survey. Mr. Lutz twice requested contributions from Dr. Snellings with reference to the fence, once for repair and once to assist in the payment for a cattle guard erected on the new levee. He leased space on the disputed strip to the outdoor advertising company. It was not until the year 1947 that events occurred which plaintiffs contend amounted to an acknowledgment which interrupted prescription.
*786 We cannot conclude from the record that Mr. Lutz possessed the land involved by sufferance or indulgence prior to 1947. The facts and the legal assumption are to the contrary.
"As to the fact itself of possession, a person is [always] presumed to have possessed as master and owner, unless it appears that the possession began in the name of and for another."
C.C. Art. 3488.
Mr. Lutz exhibited all the characteristics of an owner, and his possession was complete. Civil Code Article 3436 requires:
"To be able to acquire possession of property, two distinct things are requisite:
"1. The intention of possessing as owner.
"2. The corporeal possession of the thing."
When corporeal possession is maintained by one who intends to possess as owner, the Civil Code provides a strong presumption that the intention to retain possession continues:
"This intention of retaining possession is always supposed, where a contrary intention does not appear decidedly; so that, although a person may have abandoned the cultivation of his estate, he shall not therefore be presumed to have abandoned the possession, but shall be presumed on the contrary to have the intention of retaining it, and shall retain it in fact." C.C. Art. 3433.
"To retain the possession of a thing when a man once has it, it is not even necessary that he should have such positive intention; a negative intention suffices, that is, it suffices that the positive intention, which he had in acquiring the possession, shall not have been revoked by a contrary intention; for, so long as this revocation does not take place, the possessor is supposed always to retain his first intention [and he continues the possession], unless a third person has usurped or taken from him the possession, or he has failed to exercise an actual possession for ten years." C.C. Art. 3444.
Appellants rely strongly upon a contention that the sale by Mr. Lutz to Stovall on November 25, 1941 constituted an acknowledgment of the correct boundary, resulting in an interruption of prescription. The property sold was a 3.42 acre tract lying between Highway 165, which was constructed in 1933, and the Missouri Pacific Railroad, which formed the westerly boundary of the properties here involved. The south line of the tract sold to Stovall in 1941 was the ideal common boundary between the Snellings and the Lutz tracts.
Appellants rely on a statement in the case of Sattler v. Pellichino, La.App., 71 So.2d 689 (1st Cir. 1954), which quoted a headnote from McEvoy v. Porbes, 1 Orl. App. 56, as follows:
"Where the owner of an immovable property has held beyond his title for less than thirty years and has prior to expiration of that time conveyed his property in accord with and within the limits of his title deed, this constitutes an interruption of possession or abandonment of his material detention of the excess beyond his title."
Plaintiffs-appellants urge that the Stovall tract was separated from the balance of the Lutz property by a mere servitude (Highway 165), which cannot divide the tract, and that interruption of prescription along the boundary of the property sold to Stovall will operate to interrupt prescription along the entire fence line involved here.
The reference to the McEvoy case in Sattler v. Pellichino did not form the basis of the opinion of the court. In fact, the factual situation in Sattler v. Pellichino was the converse of that in McEvoy v. Porbes. In the McEvoy case, the *787 owner of a city lot had possessed beyond his title. He sold the entire lot by the proper description, using the ideal bounds. When subsequent owners attempted to tack on the possession of their predecessors, the court held that the sale of the entire lot described by the ideal boundaries constituted an interruption of possession and destroyed the privity essential to tacking on possession of others.
In Sattler v. Pellichino, however, Pellichino's father had possessed beyond the ideal bounds; after a fire on the farm, the family moved from the premises; Pellichino's father died, and Pellichino, a coowner purchased the interest of his mother and brothers and sisters in the farm; the description in the conveyances was apparently by the ideal boundaries, and did not include the disputed strip within the description.
The headnote in the McEvoy case does not precisely reflect what was decided. Collins, the ancestor in title who possessed beyond his boundaries, transferred his lot to his sister by a description restricted to the limits of his title. The Court said, at 1 Orleans Appeal 56, 58: "In the first place the sale of Collins to his sister in 1877without mention in his title to her of the strip referred to amounted as to her, to a clear interruption of title as to the strip in question; * * *."
The question in the McEvoy case seemed to be wholly one of the problem of tacking on possession. Under the circumstances present in the instant case, if Stovall attempted to tack on the possession of Lutz in an effort to acquire the ownership of the 50-foot strip between Stovall's south boundary and the old fence line on the Snellings property, the holding of the McEvoy case would be applicable.
There are factual differences which we think make McEvoy v. Porbes inapplicable. In the McEvoy case, the entire tract was sold; the strip in dispute consisted of a strip 2 feet 9 inches wide between a fence and the ideal boundarya parcel of such small dimensions that one would not normally expect to be severed from the main tract of land.
In the instant case, less than 3½ acres out of an approximate 23-acre tract was sold by Lutz to Stovall; the 3½ acre tract was separated from the balance of the Lutz tract by Highway 165; the strip that remained between the south boundary of the property described in the Stovall deed and the fence line is in excess of 50 feet in width; a strip of identical size on the opposite side of Highway 165 had been leased as a trailer park to Hansen. It is stipulated that "all other related property owned by plaintiffs and defendants or their successors in title * * * [has been] possessed according to proper bounds and according to deed calls." We cannot assume from the sale alone that Lutz intended to acknowledge that the Snellings owned the strip in dispute as shown on the Huey survey and intended to abandon his possession as owner of the strip which lay between the ideal boundary and the fence, from Highway 165 to the levee.
The record does not support any contention that Mr. Lutz's possession was not continuous, public, and unequivocal, at least until 1947. The fact that Mr. Lutz heard some discussion about the boundaries along the river and requested a surveyor to run his line (the surveyor reporting that "the fences varied from an inch to a foot off the true line") does not result in a change in the character of Mr. Lutz's possession. There might have been an equivocation as to the correct boundary, but there is no evidence of equivocal possession by Mr. Lutz between 1930 and 1947.
Appellant maintains that the fence involved must have been "recognized as the boundary" before Lutz can succeed.
*788 Sessum v. Hemperley, supra, announced principles applicable to this case:
"Under the provisions of LSA-C.C. Art. 852 it is observed that one who has maintained uninterrupted possession of property within existing visible bounds during thirty years may retain the quantity so possessed by him though it be beyond and more than called for by his title. This is the possession that is essential to bring this article into operation, irrespective of the good or bad faith on the part of the possessor. There is nothing in the provisions of LSA-C.C. Art. 852 which demands the element of mutual consent of the parties. Its provisions clearly provide that possession of surplus land beyond one's title shall entitle him to retain the same once his possession has continued uninterrupted within visible bounds for a period of thirty years." 96 So.2d 832, 842-843.
As long as visible bounds exist, it is not necessary that the boundary sought to be established has been "recognized as the boundary," as maintained by appellants. The acquisition of knowledge that the visible boundary does not coincide with the ideal boundary does not change the character of the possession exercised by one who claims ownership of land beyond his ideal title. It is not the knowledge of the possessor, but the character of his possession, that is important. If that possession is as owner, knowledge of the existence of the ideal boundary at a different place from the visible bounds of the land possessed should not change the nature of the possession. Possession having been commenced as owner, it is presumed to be continued in the same capacity until the contrary is shown. Civil Code Arts. 3443, 3444, 3488, 3492.
The principal question remaining to be decided is whether the events of 1947 constituted an acknowledgment on the part of Lutz that would result in the interruption of prescription.
The letters written and the two conferences which occurred between Mr. Lutz and the owners of the Snellings property in 1947 did not result in any change in the nature of the possession previously exercised by Mr. Lutz. Mr. Snellings says that Lutz acknowledged that the Huey and Keller surveys were correct, but suggested that no action be taken. It was at this time that Mr. George Snellings, Jr. declared to Mr. Lutz that any cultivation on the disputed strip was "by sufferance or permission of Mrs. Snellings."
These circumstances indicate a clear intention on the part of the Snellings to interrupt prescription which they recognized was endangering their ownership of the strip of land across their northern boundary. It is not the intention of the Snellings, however, that is controlling. It is the intention of Lutz to possess as owner, or his intention to abandon his possession and interrupt prescription by acknowledging that the Snellings own the strip of land which Lutz had possessed.
Civil Code Article 3520 provides:
"Prescription ceases likewise to run whenever the debtor, or possessor, makes acknowledgment of the right of the person whose title they prescribe."
Although Mr. Snellings stated that Lutz acknowledged the correctness of the Huey and Keller surveys, Mr. Lutz's statement was: "The first time he had any information that the true lines could be as much as 50 feet off the fence lines, was when he was so informed by Mr. George Snellings, Jr. in 1947. He had never seen a copy of the Huey survey until recently, and prior to 1947 had assumed that, if his fences were off the true line, the difference would not be more than ten feet."
Mr. Lutz further states that "he has never acknowledged that he was possessing the strip of property in dispute for anyone but himself."
An examination of the letters written by George M. Snellings, Jr. to Mr. Lutz in *789 1947 confirm the accuracy of Mr. Lutz's statement. Snellings' letter of January 7, 1947 outlines the problem and informs Mr. Lutz that another survey made by Mr. Tom Keller had verified the lines as shown on the Huey plat. The letter of January 22, 1947 refers to a conversation between Lutz and Snellings of "a couple weeks ago"; the letter relates to Lutz that Keller believes the property line on the Collins plat is the same as the property line on the Huey and Keller surveys; the Collins plat failed to indicate the location of the fence.
Snellings' letter of June 3, 1947 refers to a conversation with Mr. J. E. Peters, repeats a desire to fix the true boundary, and proceeds as follows: "If you still do not feel satisfied as to the correctness of the Huey and Keller surveys and their location of our boundary with respect to the present fence, then may I suggest this to you?" There follows a suggestion to employ jointly another engineer to make another survey.
The letter of June 29 complains of not having heard from Mr. Lutz since the letter of June 3d. The letter of September 29 indicates there has been no reply to the letter of June 3 or of July 29, and the offer to employ jointly another engineer to fix the boundary is repeated.
It is clear from Mr. Snellings' own letter that Mr. Lutz had not admitted the correctness of the Huey survey and the Keller survey as late at June 3, 1947. There is no indication in the letters of July 29 and September 29 that Mr. Lutz had made any further admission or concession. We find, therefore, that Mr. Lutz did not acknowledge the correctness of the location of the boundary and the fence as delineated on the Huey survey, and did not acknowledge the ownership of the Snellings of the strip between the fence and the ideal boundary. Even if Mr. Lutz knew, in 1930 or in 1947, that he was occupying land, the title to which was in the Snellings, that fact alone would not defeat the plea of thirty years' prescription. As stated in City of New Orleans v. Shakspeare, 39 La.Ann. 1033, 3 So. 346 (1887):

"We do not mean to hold that knowledge or belief that title is in another of itself defeats the prescription of thirty years; but such knowledge or belief, when accompanied by acts or conduct indicating acknowledgment of the adverse title justifies the legal conclusion that the party pleading that prescription did not claim to be owner, and that his possession is not under the title of owner."
We think the evidence supports the conclusion reached by the trial court, and we thus affirm the judgment rendered by that court.
For the reasons herein assigned, the judgment appealed from is affirmed. The costs of this appeal are assessed to plaintiffs-appellants.